Filed 11/8/24  P. v. Mendoza CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PAUL JOSEPH MENDOZA,<br><br>    Defendant and Appellant. | D084511<br><br><br>(Super. Ct. No. FSB19000007) |


APPEAL from a judgment of the Superior Court of San Bernardino County, Steve Malone, Judge.  Reversed in part, remanded with instructions, and otherwise affirmed.

Wallin & Klarich, Jonathan M. Lynn, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Eric Tran, Deputy Attorneys General, for Plaintiff and Respondent.

Paul Joseph Mendoza shot and killed Antony Flory in front of several eyewitnesses.  A jury found Mendoza guilty of, among other counts, first degree murder (Pen. Code, § 187, subd. (a)), and also found true related

allegations. The court sentenced Mendoza to an indeterminate term of 75 years to life for the murder.

Mendoza challenges his conviction and sentence on six grounds.

First, he contends the court erred by not instructing the jury on self-defense and voluntary manslaughter on both self-defense and heat of passion theories. We agree with the People that the record contains insufficient evidence to merit these instructions; this conclusion also forecloses Mendoza's related claim for ineffective assistance of counsel.

Second, Mendoza argues the trial court abused its discretion in excluding Flory's toxicology report. We conclude the trial court properly found the evidence irrelevant and inadmissible under Evidence Code section 352 absent expert testimony connecting the presence of the substances in Flory's system to his behavior.

Third, Mendoza contends he was prejudiced when Jane Doe, his former girlfriend, left the courtroom during a break and returned late to finish her testimony. Because this happened outside the jury's presence and with minimal impact on the trial schedule, however, we discern no error in denying Mendoza's mistrial motion on this basis.

Fourth, Mendoza claims the trial court prejudicially denied his mistrial motion based on when the prosecution allegedly threatened his trial counsel with disciplinary action or sanctions. We conclude Mendoza inadequately preserved these claims. At any rate, there was no prosecutorial misconduct, as Mendoza's interpretation of this exchange is not supported by the record.

Fifth, Mendoza argues these errors collectively deprived him of due process. But as we conclude the trial court did not err, this claim fails.

Sixth and finally, the People concede the court erred in denying Mendoza actual custody credit for his murder sentence. We thus reverse that

portion of the judgment and remand for the trial court to correct that error but otherwise affirm the judgment.

## I.

## A.

Mendoza and Jane Doe dated for six years. Although Jane largely denied it on the stand, evidence established Mendoza physically abused Jane throughout the relationship.

In December 2018, Mendoza left Jane, and Jane temporarily moved in with her mother. At the time, Jane's mother and Flory were in a committed dating relationship. Jane's children, brother, sister-in-law, M.R., and their child were also living at the mother's home. Mendoza continued to "harass" Jane while she lived with her mother.

## B.

About six weeks before Flory's death, Flory and Jane's mother saw Jane sitting on the porch with Mendoza standing over her and telling her to leave with him. Jane was crying and "looked distraught." Jane's mother told Jane she did not have to go with Mendoza, and Jane said she would stay. Jane's mother and Flory told Mendoza to leave.

At some point, either Flory "chas[ed]" Mendoza or they chased each other up and down the street, and Mendoza "didn't like that." Mendoza and Flory briefly argued, with Flory telling Mendoza to leave. M.R. saw Mendoza try to push Flory. Mendoza briefly brandished a knife at Flory but then left. Witnesses testified they thought Mendoza was "trying to scare" Flory.

The police came but said they could not do anything because Mendoza was gone, so they left.

Hours later, Mendoza returned to retrieve his backpack. He threatened Flory, angrily yelling, "'I'm going to come back for you'" before leaving.

## C.

Several days before the killing, Jane's mother left for an out-of-town trip. She gave Jane and M.R. Flory's telephone number in case they "needed anything." She was "worried about everyone" she was leaving behind. Flory, Jane, and M.R. all knew Mendoza was not welcome at Jane's mother's home.

## D.

On December 23, 2018, Jane asked Mendoza to drop off one of their children at her mother's house. Jane was upset with Mendoza during the drop-off. Mendoza asked Jane to hug him and got angry when she refused. He and Jane argued loudly and threatened one another.

Mendoza told Jane he would "shoot up [her] car." Jane had seen Mendoza with a handgun in his car, so she later told officers she thought the threat was credible. She said Mendoza "acted stupid with the gun" and was "reckless." Although Jane denied it at trial, she also told an officer that Mendoza told her "he was going to put a green light on her, or a hit on her."

M.R. saw Mendoza and Jane arguing. As the argument got louder, M.R. asked Flory to come to the house. Mendoza drove off before Flory arrived.

## E.

After hearing from M.R., Flory called an old friend and "said somebody was supposed to not be at somebody's house" and asked the friend "to help him," and the friend agreed. Flory picked his friend up and drove to Jane's mother's house. The friend understood he was going to "help" Flory "with a problem" and would do "[w]hatever it took." He later clarified he was there

"in case the[ person] ran, I was there to catch them, that's all."  Neither Flory nor his friend was armed.

According to the friend, when they arrived, Jane ran over and told them Mendoza had left.  According to Jane, Flory walked to her and explained he was there because of Mendoza.  M.R. was in the driveway with them.  Then a car drove up and Jane said, "'There he is,'" or, "I think he's coming back," referring to Mendoza.  Jane went inside the house.  According to a responding officer, Jane told him she "was afraid [Mendoza] was going to do something," so she went "to make sure her kids were inside."

Flory walked toward the fast-moving car.  Mendoza stopped his car in the middle of the street, exited, and pointed a gun at Flory.  According to the friend, Flory said "[s]omething like," "What are you gonna do?  You gonna shoot me?" while continuing to walk toward Mendoza.  Flory's hands were up with his palms open.  Mendoza said nothing before shooting at Flory two to three times in quick succession.

M.R. similarly testified Mendoza stopped his car suddenly, Mendoza pointed a gun at Flory, Flory walked toward him, and they "exchanged words."  Specifically, she recalled Flory loudly saying, "'you need to go, foo [sic]'" and "'you're not welcome here, dawg.'"  Then she "heard gunshots"—two or three in total—before the car sped away.

According to a neighbor, after Mendoza exited the car with a gun in his hand, Flory and Mendoza "argu[ed]" for several minutes.  Mendoza chased Flory around Flory's car.  Mendoza then shot twice.  The neighbor saw Flory fall to the ground and heard him say, "'Oh, shit.'"

According to Flory's friend, the first bullet hit Flory's thigh.  Flory said, "'Shit.  He shot me.  It hurts,'" and slowly moved in the direction of his car to

try to hide.  Another bullet hit one of the tires of Flory's car.  After firing the shots, Mendoza quickly reentered his car and left.

Flory collapsed, and his friend yelled for help.  M.R. called 9-1-1 to request an ambulance because "someone shot [her] dad."  She identified the shooter as Mendoza.

Within five minutes, police officers arrived at the scene.  Flory died of the gunshot wound to his thigh.

## F.

Officers obtained footage from a neighbor's video camera.  It registered the sound of a gunshot, women screaming, and the neighbor repeating, "He shot him."  The neighbor, who did not see the shooting, heard two gunshots: one while in her driveway and the other after running inside her house.

Another neighbor was outside when Mendoza was driving back to Jane's mother's house the final time.  She threw her arms up in the air to signal he was driving too fast.  Mendoza drove to the end of the street, U-turned, and stopped by her.  He "stare[d] at [her] with a mean," "angry," "threatening" look for about 30 seconds before driving off.  Less than a minute later she heard two gunshots "right behind each other."

## G.

Although the gun recovered from Mendoza's car did not match the casing and bullet fragment recovered at the scene, Mendoza discussed getting rid of "the gun" when calling his girlfriend from jail.

## H.

The defense rested without presenting evidence.  The court determined there was insufficient evidence to merit the defense's requested self-defense and imperfect self-defense instructions.

The jury found Mendoza guilty of one count of first degree murder (§ 187, subd. (a); count 1); two counts of possession of a firearm by a prohibited person (§ 29800(a)(1); counts 2 & 3); and one count of criminal threats (§ 422(a); count 4). On the murder count, it also found true Mendoza personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53(d).) Mendoza admitted a prior conviction.

The court sentenced Mendoza to a determinate term of five years, four months for counts 3 and 4 and a consecutive indeterminate term of 75 years to life for count 1. It awarded no actual custody credits as to count 1 "as a matter of law" but awarded credits as to counts 3 and 4.

## II.

We address each of Mendoza's six challenges.

## A.

Mendoza first claims (1) the trial court erred in refusing to instruct the jury on self-defense and voluntary manslaughter on both self-defense and heat of passion theories; and (2) to the extent his trial counsel failed to request the heat of passion instruction, he received ineffective assistance of counsel. We conclude the trial court did not err and the ineffective assistance of counsel claim therefore fails.

## 1.

A trial court must instruct the jury on a lesser included offense, even absent a request from the defendant, if there is substantial evidence the defendant committed the lesser but not the greater offense. (*People v. Simon* (2016) 1 Cal.5th 98, 132.) "The obligation also applies, with reservations not applicable here, to instruction on defenses when they are supported by substantial evidence." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

7

But "the existence of '*any* evidence, no matter how weak[,]' will not justify instructions on a lesser included offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  Rather, it must be "evidence that a reasonable jury could find persuasive" (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8) or, put another way, "evidence . . . 'substantial enough to merit consideration' by the jury" (*Breverman,* at p. 162).  "Speculative, minimal, or insubstantial evidence is insufficient." (*Simon*, 1 Cal.5th at p. 132.)

We review a trial court's failure to instruct on a lesser included offense de novo, viewing the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

2.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).)  Manslaughter, meanwhile, "is the unlawful killing of a human being without malice" (§ 192) and "is a lesser included offense of murder" (*People v. Beltran* (2013) 56 Cal.4th 935, 942).

A killing is justified as perfect self-defense when the killer has "reasonable ground" to anticipate an "imminent danger" of "great bodily injury" or death.  (§ 197.)  Not only must "the circumstances . . . be sufficient to excite the fears of a reasonable person," but also "the party killing must have acted under the influence of such fears alone."  (§ 198.)

Imperfect self-defense is when someone kills in the "unreasonable but good faith belief" that self-defense is required.  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116.)  "[T]he belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter" rather than murder.  (*Ibid.*)  Like perfect self-defense, the imperfect self-defense doctrine is narrow, as it requires the defendant have an *actual* belief in the need for self-defense to avoid *imminent* danger to life or great bodily injury.  (*People v.*

8

*Booker* (2011) 51 Cal.4th 141, 182.) "The peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" (*In re Christian S.* (1994) 7 Cal.4th 768, 783 [cleaned up].)

A killing is also voluntary manslaughter if committed "upon a sudden quarrel or heat of passion." (§ 192(a).) For this form of manslaughter, both "provocation *and* heat of passion must be affirmatively demonstrated." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 [cleaned up].) The victim must provoke the heat of passion, or the defendant must have "reasonably believed" the victim engaged in the provocative conduct. (*People v. Avila* (2009) 46 Cal.4th 680, 705 [cleaned up].) Heat of passion voluntary manslaughter has "both an objective and a subjective component." (*Steele*, 27 Cal.4th at p. 1252.) "The defendant must actually, subjectively, kill under the heat of passion." (*Ibid.*) Additionally, "the circumstances giving rise to the heat of passion" must be "sufficient to arouse the passions of the ordinary reasonable" person. (*Id.* at pp. 1252-1253 [cleaned up].)

3.

Mendoza claims substantial evidence supported instructions on perfect and imperfect self-defense. He relies on the facts that (1) Flory's friend accompanied Flory and "was prepared to do what it takes"[1] and (2) Flory loudly "confronted" him. Yet, viewing those two facts in context, we agree with the People that the record lacks evidence of Mendoza's subjective belief in the need to defend himself against imminent, significant harm.

---

[1] While Mendoza notes Flory's friend's testimony "was hardly forthcoming," that is not relevant to our determination of whether sufficient evidence simply exists such that the jury should be entitled to decide perfect or imperfect self-defense and make any attendant credibility determinations itself. (*People v. Strozier* (1993) 20 Cal.App.4th 55, 63.)

Although witness' accounts varied to some degree, much of the evidence about what happened between Flory and Mendoza was undisputed. Mendoza stepped out of the car holding a gun pointed at Flory. No one saw Flory or his friend with any weapons. Though Flory approached Mendoza and told him he was unwelcome and had to leave, no one testified to any verbal or physical threats made by Flory. In fact, Flory's friend testified that Flory approached Mendoza calmly with his empty hands in the air. Mendoza said nothing before shooting Flory.

With no direct evidence of Mendoza's state of mind, the above objective evidence relevant to his subjective perceptions fails to disclose any circumstances from which Mendoza—or any reasonable person—could have perceived and feared an imminent threat of death or great bodily injury from Flory. (See *Simon,* 1 Cal.5th at pp. 133-134 [where defendant did not testify, no subjective fear of imminent harm from verbal argument with unarmed decedent].) Accordingly, the court did not err in denying Mendoza's requested self-defense instructions.

4.

Mendoza also claims the record supported an instruction on voluntary manslaughter under a heat of passion theory. His argument relies on the "history" between Mendoza and Flory—namely, the November 2018 incident; Flory's friend's presence at the scene; Mendoza's preceding fight with Jane; and M.R.'s testimony that Flory loudly told Mendoza he needed to go and was not welcome. To the extent trial counsel forfeited this error by failing to request such an instruction below, Mendoza asserts his counsel was ineffective. We address the merits of Mendoza's contention without regard to forfeiture because the evidence was insufficient to warrant an instruction on

heat of passion. This conclusion forecloses Mendoza's derivative ineffective assistance of counsel claim. (*People v. Huggins* (2006) 38 Cal.4th 175, 208.)

As the People note, no evidence showed the emotions Mendoza subjectively experienced *at the time* he shot Flory. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709.) To the extent the record contains evidence of Mendoza's emotions *before* the shooting, it suggests he was angry about his fight with Jane rather than angry with Flory directly. But provocation must come from *the victim*; so, to the extent Mendoza relies on his fight with Jane, that evidence is unavailing. (*Avila*, 46 Cal.4th at p. 705.)

Additionally, the evidence was insufficient as a matter of law to support objectively sufficient provocation. Viewed most favorably to Mendoza, the facts show he and Flory argued roughly six weeks before the shooting, at which time Flory chased Mendoza around the block and Mendoza drew a knife to "scare" Flory. But, the day of the incident, Flory walked unarmed and with his arms in the air toward Mendoza, who was pointing a gun at Flory, and loudly told Mendoza he had to leave and was not welcome. No reasonable jury would have found these two incidents, even cumulatively, sufficient to provoke Mendoza's actions. The People aptly rely on *Gutierrez* for this point, in which the court found a heat of passion instruction unwarranted where the decedent had helped a bartender physically remove the defendant from a bar. (*Gutierrez*, 112 Cal.App.4th at pp. 707, 709.) If physically removing someone from the premises is not adequate provocation, verbally requesting someone leave the premises is even farther off the mark.

We accordingly perceive no error in not instructing on heat of passion manslaughter. Thus, we need not address the ineffective assistance of counsel argument.

11

B.

Second, Mendoza claims the trial court erred in excluding Flory's toxicology report. We conclude otherwise.

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) The court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) We review rulings on the admissibility of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) Even if the trial court's reasons for excluding evidence are incorrect, we will affirm so long as it was a decision correct in law. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

Flory's toxicology report showed he had alcohol and other intoxicants in his system at the time of his death. The court ruled the evidence irrelevant absent expert testimony establishing the correlation between the drugs and Flory's behavior, as "[m]ere speculation is not sufficient to establish relevance." Defense counsel stated she did not intend to call an expert, so the court found the evidence inadmissible "at this point" of the case and "on the record [it had] now," which was after "a couple days of testimony" from "only" the first witness. Later, defense counsel attempted to cross-examine the forensic pathologist on toxicology testing, but the court excluded the evidence because it "already made a ruling prior to trial."

Mendoza argues the toxicology report "was highly probative" to his perfect and imperfect self-defense theories. Relying on a federal decision, he claims the trial court "should not have permitted the jury to labor under the

12

false impression that Mr. Flory was stone sober [sic]." (Citing *Harris v. Cotton* (7th Cir. 2004) 365 F.3d 552.)[2] The People counter that the evidence had minimal probative value given the testimony of multiple eyewitnesses to Flory's demeanor and behavior. Meanwhile, admitting the testimony without appropriate expert testimony "would have caused [the] jurors to speculate about the victim's behavior, rather than focus on the testimony and credibility of the witnesses," and "unduly consume[d] time, confuse[d] the issues," and misled the jury. We agree with the People.

The court did not, as Mendoza suggests, forever foreclose admitting the toxicology report. Although the evidence lacked relevance on the record "at th[at] point," the court indicated a willingness to revisit its decision as the record developed during trial. But the defense disclaimed any plan to call an expert to explain the way the drugs in Flory's system may have affected his behavior and rested on the state of the prosecution's evidence, which the court found insufficient to support a self-defense theory. We thus agree with the People that the court's exclusion of this evidence fails to amount to an abuse of discretion.

As the People argue, absent establishing the connection between the substances and Flory's behavior, the evidence was speculative. (Citing *People v. Stitely* (2005) 35 Cal.4th 514, 549-550.) The factual differences Mendoza notes between *Stitely* and his case do not alter the fundamentally speculative nature of the proposed evidence absent expert testimony. Without that link,

---

2    Mendoza's citation to *Harris* is at best persuasive, not binding, authority. (*People v. Estrada* (1965) 234 Cal.App.2d 136, 145.) Here, it fails to persuade, as *Harris* addressed whether the wholesale failure to obtain a victim's toxicology report was ineffective performance by counsel when the defendant was asserting an affirmative defense of self-defense. (*Harris*, 365 F.3d at pp. 555-556.) The case is thus unlike the issue here.

the evidence was irrelevant to any material issue in dispute; thus, the court was not obligated to admit it. (*People v. Kelly* (1992) 1 Cal.4th 495, 523.)

At any rate, multiple eyewitnesses had already testified about Flory's behavior and demeanor at the relevant time. None testified to noticeable intoxication. And Mendoza introduced no evidence he knew or perceived Flory to be intoxicated and that such knowledge or perception prompted his actions. The court rationally could have decided on this basis that any minimal probative value was substantially outweighed by the likelihood of confusing the jury with evidence likely to lead to speculation absent expert testimony. (*See People v. Hardy* (2018) 5 Cal.5th 56, 86-87 [no abuse of discretion to exclude in guilt phase victim's toxicology report to explain behavior when it "risked sidetracking the trial"].) We thus conclude Mendoza is not entitled to relief on this claim.

C.

Next, Mendoza argues the trial court erroneously denied his motions for mistrial when (1) Jane left the courtroom and initially failed to reappear to complete her testimony, and (2) the prosecution allegedly threatened defense counsel with sanctions and state bar discipline.

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) Because this inquiry "is by its nature a speculative matter," the court has "considerable discretion." (*Ibid.*) A court should grant a motion for a mistrial only "when a defendant's chances of receiving a fair trial have been irreparably damaged." (*People v. Collins* (2010) 49 Cal.4th 175, 198-199 [cleaned up].) We review the denial of a motion for mistrial for abuse of discretion. (*Id.* at p. 198.)

14

1.

According to Mendoza, a mistrial was warranted when Jane abruptly asked for a break while testifying, failed to reappear after the break, and then resumed her testimony after lunch. We disagree.

At the beginning of her testimony, Jane stated she was "kind of shaky" because she and her children were "in a car accident yesterday." She testified to having visited Mendoza in jail since the shooting. Jane later repeated that she had been in an accident and shortly after asked for a break. The court declared a recess until 11:40 a.m. Jane failed to reappear after the break, so the court declared an early lunch recess until 1:30 p.m., telling the jury that "[t]he bailiff has looked up and down the hallway and has not found" Jane. Jane returned after the lunch recess.

Before resuming Jane's testimony, Mendoza's counsel requested a mistrial outside the jury's presence, contending Jane's testimony suggested "that somehow [Jane]'s doing this at [Mendoza's] behest or on his behalf." The court said Mendoza's counsel could cross-examine Jane on "any connection with her actions with" Mendoza but the incident did not merit a mistrial. When the jury returned, the court merely stated it would "resume with our direct examination."

Mendoza has failed to show the court's denial of his motion was arbitrary or "patently absurd." (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.) As the People note, most of the incident took place outside the jury's presence and without its knowledge. Further, as Jane left just before lunchtime and came back before court was set to resume after lunch, the incident was less noticeable to the jury than had Jane taken off earlier or failed to return from lunch. Lastly, to the extent the jury may have speculated about why Jane failed to return, they were far more likely to

15

attribute her absence to her repeated references to her car accident—one just minutes before she left—than her admission to visiting Mendoza in jail. Ultimately, on this record we cannot conclude the incident irreparably damaged Mendoza's right to a fair trial.

2.

Mendoza also argues comments by the prosecutor outside the jury's presence amounted to prosecutorial misconduct, so it was error for the trial court to deny his related mistrial motion. We disagree.

When the prosecutor was contesting the propriety of Mendoza's counsel's cross-examination of a witness *outside* the jury's presence, she stated: "Had the prosecution done that to the defense, I truly think our bar cards would have been on the line." The prosecutor later stated that if such questioning continued, "we will be asking the Court for an admonishment, even possibly sanctions." The court asked "both sides, particularly the prosecution," not to "make any reference to bar cards or misconduct."

Mendoza's counsel then said, "I feel like I'm walking a thin line of having to be so very careful on each and every statement I make . . . . And I feel like I can't go on with those thoughts that are being expressed right now. I feel I need to ask for a mistrial because I cannot cross-examine the witnesses. [¶] . . . [¶] I'm being told that, hey, you know, you're trying to—your bar card, you should be impeached, you should be sanctioned. [¶] So I feel like I cannot express myself in trial, and I feel like I can't go on because now I feel like, well, any question I ask could subject me to a sanction or a complaint."

The court responded that it "called [the prosecutor] out on that" behavior and "asked her not to continue to do that." Later, the prosecutor

16

clarified she was "not accusing the defense of misconduct" and "not making those allegations."

As an initial matter, the People contend Mendoza forfeited these claims because his counsel "never explicitly moved for a mistrial or requested a finding of prosecutorial misconduct." We agree that on this record Mendoza failed to preserve these claims.

First, "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct." (*People v. Hill* (1998) 17 Cal.4th 800, 820 [cleaned up].) Here, while Mendoza's counsel claimed to have felt constrained in her ability to effectively represent her client given the prosecutor's statements, at no point did counsel contend these statements rose to the level of prosecutorial misconduct. Nor does Mendoza claim it would have been futile for his counsel to object to the statements as misconduct. (*People v. Fuiava* (2012) 53 Cal.4th 622, 680.) Thus, to the extent Mendoza argues on appeal that the prosecutor's statements rose to the level of prosecutorial misconduct, that claim was not preserved and so it is forfeited. (See *Collins,* 49 Cal.4th at p. 198.)

Second, the record "taken as a whole" does not, as Mendoza claims, indicate his counsel actually intended to move forward on a motion for a mistrial. While Mendoza's counsel stated she felt she "need[ed] to ask for a mistrial" and could not "go on," rather than pursue the motion, she instead discussed her concerns with the court and ended the conference by thanking the judge and asking about the next day's logistics. We thus conclude counsel's failure to make clear she continued to believe a mistrial was necessary forfeited the issue on appeal.

17

Regardless, Mendoza's claim fails on the merits. "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted." (*People v. Riggs* (2008) 44 Cal.4th 248, 298, quoting *People v. Strickland* (1974) 11 Cal.3d 946, 955.) "Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights but is otherwise worthy of condemnation is not a constitutional violation unless the challenged action so infected the trial with unfairness as to make the resulting conviction a denial of due process." (*Ibid.* [cleaned up].)

There was no prosecutorial misconduct on this record. The prosecutor simply stated her belief that her team may have been subjected to discipline had it cross-examined witnesses in the way Mendoza's counsel had. This was not a threat to file disciplinary charges in order to constrain Mendoza's counsel's ability to zealously represent her client; indeed, the prosecutor put on the record that she was not alleging any misconduct.

Even absent that clear disclaimer, the language is not reasonably read as a "clear threat" to report Mendoza's counsel to the state bar, as Mendoza claims. "A prosecutor is held to a standard higher than that imposed on other attorneys." (*Hill,* 17 Cal.4th at p. 820.) Because of that different standard, the prosecutor's speculation about her own team does not reasonably imply Mendoza's counsel should have been disciplined. Moreover, as the People note, because of the prosecutor's objections, the court did instruct Mendoza's counsel to refrain from engaging in some of the lines of

18

questioning the prosecutor raised. This further undercuts an inference of prosecutorial misconduct.

To the extent Mendoza invokes rule 3.10 of the California Rules of Professional Conduct—which he concedes applies only to a "civil dispute"—as a basis for finding misconduct in this criminal matter, he provides no legal authority for his position that the Evidence Code or the state's ethics rules render a dispute in a criminal matter a "civil dispute." The argument is thus forfeited. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363.)

As there was no prosecutorial misconduct, the trial court did not abuse its discretion in denying a mistrial premised on the prosecutor's statements.

D.

Mendoza claims the above errors collectively deprived him of due process. But as "[w]e have found no error, and thus no cumulative error[, r]eversal is not required." (*People v. Coryell* (2003) 110 Cal.App.4th 1299, 1309.)

E.

Finally, the People concede the trial court erred in pronouncing Mendoza's sentence. During the sentencing hearing, the court found Mendoza was "entitled to zero actual credits as a matter of law" for his murder conviction. As this was error, we accept the People's concession.

Generally, a defendant held in presentence custody is entitled to credit toward their sentence for time served. (Pen. Code, § 2900.5(a).) While section 2933.2(a) provides defendants convicted of murder "shall not accrue any credit, as specified in Section 2933 or Section 2933.05," those sections concern only worktime and program credit reductions. "Therefore[, Mendoza] was entitled to presentence custody credit pursuant to section 2900.5, and

19

the trial court erred by denying [Mendoza] custody credit in reliance on section 2933.2." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)

### III.

We reverse the portion of the judgment granting zero actual presentence custody credits for count 1 (first degree murder (§ 187, subd. (a))) and remand for the trial court to recalculate Mendoza's custody credits consistent with this opinion. Following resentencing, the trial court shall send a copy of the revised abstract of judgment to the Department of Corrections and Rehabilitation. We otherwise affirm the judgment.

CASTILLO, J.

WE CONCUR:

DATO, Acting P. J.

DO, J.

20